Order in Pending Case

# SUPREME COURT OF THE UNITED STATES

_____

No. 13A1284

_____

## WHEATON COLLEGE *v.* SYLVIA BURWELL, SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL.

ON APPLICATION FOR INJUNCTION

[July 3, 2014]

The application for an injunction having been submitted to JUSTICE KAGAN and by her referred to the Court, the Court orders: If the applicant informs the Secretary of Health and Human Services in writing that it is a non-profit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services, the respondents are enjoined from enforcing against the applicant the challenged provisions of the Patient Protection and Affordable Care Act and related regulations pending final disposition of appellate review. To meet the condition for injunction pending appeal, the applicant need not use the form prescribed by the Government, EBSA Form 700, and need not send copies to health insurance issuers or third-party administrators.

The Circuit Courts have divided on whether to enjoin the requirement that religious nonprofit organizations use EBSA Form 700. Such division is a traditional ground for certiorari. See S. Ct. Rule 10(a).

Nothing in this interim order affects the ability of the applicant's employees and students to obtain, without cost, the full range of FDA approved contraceptives. The Government contends that the applicant's health insurance issuer and third-party administrator are required by federal law to provide full contraceptive coverage regardless whether the applicant completes EBSA Form 700.

The applicant contends, by contrast, that the obligations of its health insurance issuer and third-party administrator are dependent on their receipt of notice that the applicant objects to the contraceptive coverage requirement. But the applicant has already notified the Government—without using EBSA Form 700—that it meets the requirements for exemption from the contraceptive coverage requirement on religious grounds. Nothing in this order precludes the Government from relying on this notice, to the extent it considers it necessary, to facilitate the provision of full contraceptive coverage under the Act.

In light of the foregoing, this order should not be construed as an expression of the Court's views on the merits.

JUSTICE SCALIA concurs in the result.

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG and JUSTICE KAGAN join, dissenting.

The Patient Protection and Affordable Care Act, 124 Stat. 119, through its implementing regulations, requires employer group health insurance plans to cover contraceptive services without cost sharing. Recognizing that people of religious faith may sincerely oppose the provision of contraceptives, the Government has created certain exceptions to this requirement. Churches are categorically exempt. Any religious nonprofit is also exempt, as long as it signs a form certifying that it is a religious nonprofit that objects to the provision of contraceptive services, and provides a copy of that form to its insurance issuer or third-party administrator. The form is simple. The front asks the applicant to attest to the foregoing representations; the back notifies third-party administrators of their regulatory obligations.

The matter before us is an application for an emergency injunction filed by Wheaton College, a nonprofit liberal arts college in Illinois. There is no dispute that Wheaton is entitled to the religious-nonprofit exemption from the

contraceptive coverage requirement. Wheaton nonetheless asserts that the exemption itself impermissibly burdens Wheaton's free exercise of its religion in violation of the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U. S. C. §2000bb *et seq.*, on the theory that its filing of a self-certification form will make it complicit in the provision of contraceptives by triggering the obligation for someone else to provide the services to which it objects. Wheaton has not stated a viable claim under RFRA. Its claim ignores that the provision of contraceptive coverage is triggered not by its completion of the self-certification form, but by federal law.

Even assuming that the accommodation somehow burdens Wheaton's religious exercise, the accommodation is permissible under RFRA because it is the least restrictive means of furthering the Government's compelling interests in public health and women's well-being. Indeed, just earlier this week in *Burwell* v. *Hobby Lobby Stores, Inc.*, *ante,* at ___, the Court described the accommodation as "a system that seeks to respect the religious liberty of religious nonprofit corporations while ensuring that the employees of these entities have precisely the same access to all [Food and Drug Administration (FDA)]-approved contraceptives as employees of companies whose owners have no religious objections to providing such coverage." *Ante,* at 3. And the Court concluded that the accommodation "constitutes an alternative that achieves all of the Government's aims while providing greater respect for religious liberty." *Ibid.* Those who are bound by our decisions usually believe they can take us at our word. Not so today. After expressly relying on the availability of the religious-nonprofit accommodation to hold that the contraceptive coverage requirement violates RFRA as applied to closely held for-profit corporations, the Court now, as the dissent in *Hobby Lobby* feared it might, see *ante,* at 29–30 (GINSBURG, J., dissenting), retreats from that position.

That action evinces disregard for even the newest of this Court's precedents and undermines confidence in this institution.

Even if one accepts Wheaton's view that the self-certification procedure violates RFRA, that would not justify the Court's action today. The Court grants Wheaton a form of relief as rare as it is extreme: an inter-locutory injunction under the All Writs Act, 28 U. S. C. §1651, blocking the operation of a duly enacted law and regulations, in a case in which the courts below have not yet adjudicated the merits of the applicant's claims and in which those courts have declined requests for similar injunctive relief. Injunctions of this nature are proper only where "the legal rights at issue are indisputably clear." *Turner Broadcasting System, Inc.* v. *FCC*, 507 U. S. 1301, 1303 (1993) (Rehnquist, C. J., in chambers) (internal quotation marks omitted). Yet the Court today orders this extraordinary relief even though no one could credibly claim Wheaton's right to relief is indisputably clear.

The sincerity of Wheaton's deeply held religious beliefs is beyond refute. But as a legal matter, Wheaton's appli-cation comes nowhere near the high bar necessary to warrant an emergency injunction from this Court. For that reason, I respectfully dissent.

## I
## A

The Affordable Care Act requires certain employer group health insurance plans to cover a number of preven-tative-health services without cost sharing. These services include "[a]ll Food and Drug Administration . . . approved contraceptive methods, sterilization procedures, and pa-tient education and counseling for all women with repro-ductive capacity, as prescribed by a provider." 77 Fed. Reg. 8725 (2012) (brackets and internal quotation marks

omitted). As a practical matter, the provision ensures that women have access to contraception at no cost beyond their insurance premiums. Employers that do not comply with the mandate are subject to civil penalties.

Recognizing that some religions disapprove of contraceptives, the Government has sought to implement the mandate in a manner consistent with the freedom of conscience. It has categorically exempted any group health plan of a "religious employer," as defined by reference to the Tax Code provision governing churches. See 45 CFR §147.131(a); http://hrsa.gov/womensguidelines (as visited July 2, 2014, and available in Clerk of Court's case file). And it has extended a further accommodation to religious nonprofits that do not satisfy the categorical exemption. All agree that Wheaton qualifies as a religious nonprofit.

To invoke the accommodation and avoid civil penalties, a religious nonprofit need only file a self-certification form stating (1) that it "opposes providing coverage for some or all of any contraceptive services required to be covered under [the regulation] on account of religious objections," (2) that it "is organized and operates as a nonprofit entity," and (3) that it "holds itself out as a religious organization." §147.131(b). The form is reprinted in an appendix to this opinion. Any organization that completes the form and provides a copy to its insurance issuer or third-party administrator[1] need not "contract, arrange, pay, or refer for contraceptive coverage" to which it objects. 78 Fed. Reg. 39874 (2013); see 29 CFR §2590.715–2713A(b)(1) and (c)(1). Instead, the insurance issuer or third-party admin-

_____

[1] Typically, an employer contracts to pay a health insurer to provide coverage; the insurer both covers the cost of medical claims and manages the process for administering those claims. Employers who maintain self-insured plans cover the cost of claims for medical treatment directly. Such employers often contract with third-party administrators to administer the claims process.

istrator must provide contraceptive coverage for the organization's employees and may not charge the organization any premium or other fee related to those services. The back of the self-certification form reminds third-party administrators that receipt of the form constitutes notice that they must comply with their regulatory obligations. See Appendix, *infra*.

### B

Rather than availing itself of this simple accommodation, Wheaton filed suit, asserting that completing the form and submitting it to its third-party administrator would make it complicit in the provision of contraceptive coverage, in violation of its religious beliefs. On that basis, it sought a preliminary injunction, claiming that the law and regulations at issue violate RFRA, which provides that the Government may not "substantially burden a person's exercise of religion" unless the application of that burden "is the least restrictive means of furthering [a] compelling governmental interest." 42 U. S. C. §§2000bb–1(a) and (b).[2]

The District Court denied a preliminary injunction on the ground that the regulations exempting Wheaton from the contraceptive coverage requirement do not substantially burden its exercise of religion. App. to Emergency Application for Injunction Pending Appellate Review 1–20. Under Circuit precedent, the court reasoned, Wheaton's act of "filling out the form and sending it to the [third-party administrator]" in no way "triggers" coverage of contraception costs. *Id.,* at 9 (internal quotation marks omitted). The Seventh Circuit in turn denied Wheaton's motion for an injunction pending appeal. See Order in No. 14–2396 (CA7, June 30, 2014). In doing so, it relied on

---

[2] Wheaton also raised claims under the First Amendment and the Administrative Procedure Act. Because it does not press those claims in this Court as a basis for injunctive relief, I do not discuss them.

this Court's pronouncement in *Hobby Lobby* "that the accommodation provision (applicable in this case) 'constitutes an alternative that achieves all of the Government's aims while providing greater respect for religious liberty.'" *Ibid.*

Wheaton applied to JUSTICE KAGAN, in her capacity as Circuit Justice for the Seventh Circuit, for an emergency injunction against enforcement of the law and regulations pending resolution of its legal challenge. She referred the matter to the Conference, which entered a temporary injunction and called for a response from the Government. See *ante,* at \_\_\_. After receipt of the Government's response, the Court today enters an order granting injunctive relief.

## II

### A

I disagree strongly with what the Court has done. Wheaton asks us to enjoin the enforcement of a duly enacted law and duly promulgated regulations before the courts below have passed on the merits of its legal challenge. Relief of this nature is extraordinary and reserved for the rarest of cases. With good reason. The only source of authority for this Court to issue an injunction pending review in the lower courts is the All Writs Act, which provides that this Court "may issue all writs necessary or appropriate in aid of [its] . . . jurisdictio[n] and agreeable to the usages and principles of law." 28 U. S. C. §1651(a). This grant of equitable power is a failsafe, "to be used 'sparingly and only in the most critical and exigent circumstances.'" *Ohio Citizens for Responsible Energy, Inc.* v. *NRC*, 479 U. S. 1312, 1313 (1986) (SCALIA, J., in chambers).

Under our precedents, "[a]n injunction is appropriate only if (1) it is necessary or appropriate in aid of our jurisdiction, and (2) the legal rights at issue are indisputably

clear." *Turner Broadcasting System*, 507 U. S., at 1303
(brackets, internal quotation marks, and citations omit-
ted).[3] To understand how high a bar that second prong is,
consider that this Court has previously pointed to differ-
ences of opinion among lower courts as proof positive that
the standard has not been met. See *Lux* v. *Rodrigue*s, 561
U. S. 1306, 1308 (2010) (ROBERTS, C. J., in chambers)
(observing that "the courts of appeals appear to be reach-
ing divergent results" respecting the applicant's claim, and
that, "[a]ccordingly, . . . it cannot be said that his right to
relief is 'indisputably clear'"). Neutral application of this
principle would compel the denial of Wheaton's application
without any need to examine the merits, for two Courts of
Appeals that have addressed similar claims have rejected
them. See *Notre Dame* v. *Sebelius*, 743 F. 3d 547 (CA7
2014); *Michigan Catholic Conference and Catholic Family
Services* v. *Burwell*, ___ F. 3d ___, 2014 WL 2596753 (CA6,
June 11, 2014).[4] Remarkably, the Court uses division

_____

[3] Indeed, some of my colleagues who act to grant relief in this case
have themselves emphasized the exceedingly high burden that an
applicant must surmount to obtain an interlocutory injunction under
the All Writs Act. See *Lux* v. *Rodrigues*, 561 U. S. 1306, 1307 (2010)
(ROBERTS, C. J., in chambers) (an applicant must demonstrate that "the
legal rights at issue are indisputably clear" in order to obtain such
injunctive relief) (internal quotation marks omitted); *Respect Maine
PAC* v. *McKee*, 562 U. S. ___, ___ (2010) (unlike a stay of a lower court's
order, a request for an injunction against the enforcement of a law
"'does not simply suspend judicial alteration of the status quo but
grants judicial intervention that has been withheld by lower courts'")
(quoting *Ohio Citizens for Responsible Energy, Inc.* v. *NRC*, 479 U. S.
1312, 1313 (1986) (SCALIA, J., in chambers)).

[4] To be sure, two other Courts of Appeals have recently granted tem-
porary injunctions similar to the one Wheaton seeks here. See Order in
*Eternal Word Television Network, Inc.* v. *Secretary, U. S. Dept. of
Health and Human Services*, No. 14–12696–CC (CA11, June 30, 2014)
(granting injunction pending appeal); Order in *Diocese of Cheyenne* v.
*Burwell*, No. 14–8040 (CA10, June 30, 2014) (same). Although denying
the injunction in this case would produce a different outcome, the
Government could of course move to vacate those injunctions were we

among the Circuits as a justification for the issuance of its order, noting that "division is a traditional ground for certiorari." *Supra*, at 1. But a petition for writ of certiorari is not before us. Rather, given the posture of this application—for an emergency injunction under the All Writs Act—division of authority is reason *not* to grant relief.

B

Wheaton's RFRA claim plainly does not satisfy our demanding standard for the extraordinary relief it seeks.

For one thing, the merits of this case are not before this Court for full review; adjudication of the merits is still pending in the District Court. So nothing necessitates intervention in order to "'aid . . . our jurisdiction,'" *Turner Broadcasting System*, 507 U. S., at 1301 (alterations omitted), over any eventual certiorari petition from a decision rendered below. If the Government is allowed to enforce the law, either Wheaton will file the self-certification form, or it will not. Either way, there will remain a live controversy that this Court could adjudicate after the case is decided on the merits below. And either way, if Wheaton is correct in its challenge to the law, its rights will be vindicated and it will obtain the relief it seeks.

As to the merits, Wheaton's claim is likely to fail under any standard, let alone the standard that its entitlement to relief be "'indisputably clear,'" *ibid*. Wheaton asserts that filing the self-certification form might ultimately result in the provision of contraceptive services to its employees, thereby burdening its religious exercise. And it points out that if it does not file the form, it will face civil penalties. But it is difficult to understand how these arguments make out a viable RFRA claim.

RFRA requires Wheaton to show that the accommoda-

_____

to deny this one. Moreover, while uniformity certainly is important, uniform error is not.

tion process "substantially burden[s] [its] exercise of reli-gion." §2000bb–1(a). "Congress no doubt meant the modi-fier 'substantially' to carry weight." *Hobby Lobby*, 573 U. S., at ___ (GINSBURG, J., dissenting) (slip op., at 20). Wheaton, for religious reasons, categorically opposes the provision of contraceptive services. The Government has given it a simple means to opt out of the contraceptive coverage mandate—and thus avoid any civil penalties for failing to provide contraceptive services—and a simple means to tell its third-party administrator of its claimed exemption.

Yet Wheaton maintains that taking these steps to avail itself of the accommodation would substantially burden its religious exercise. Wheaton is "religiously opposed to emergency contraceptives because they may act by killing a human embryo." Emergency Application for Injunction Pending Appellate Review 11. And it "believes that au-thorizing its [third-party administrator] to provide these drugs in [its] place makes it complicit in grave moral evil." *Ibid.* Wheaton is mistaken—not as a matter of religious faith, in which it is undoubtedly sincere, but as a matter of law: Not every sincerely felt "burden" is a "substantial" one, and it is for courts, not litigants, to identify which are. See *Hobby Lobby*, 573 U. S., at ___ (GINSBURG, J., dissenting) (slip op., at 21–22). Any provision of contra-ceptive coverage by Wheaton's third-party administrator would not result from any action by Wheaton; rather, in every meaningful sense, it would result from the relevant law and regulations. The law and regulations require, in essence, that *some* entity provide contraceptive coverage. A religious nonprofit's choice not to be that entity may leave someone else obligated to provide coverage instead—but the obligation is created by the contraceptive coverage mandate imposed by law, not by the religious nonprofit's

choice to opt out of it.[5]

Let me be absolutely clear: I do not doubt that Wheaton genuinely believes that signing the self-certification form is contrary to its religious beliefs. But *thinking* one's religious beliefs are substantially burdened—no matter how sincere or genuine that belief may be—does not make it so.

An analogy used by the Seventh Circuit may help to explain why Wheaton's complicity theory cannot be legally sound:

"Suppose it is wartime, there is a draft, and a Quaker is called up. Many Quakers are pacifists, and their pacifism is a tenet of their religion. Suppose the Quaker who's been called up tells the selective service system that he's a conscientious objector. The selective service officer to whom he makes this pitch accepts the sincerity of his refusal to bear arms and excuses him. But as the Quaker leaves the selective service office, he's told: 'you know this means we'll have to draft someone in place of you'—and the Quaker replies indignantly that if the government does that, it will be violating his religious beliefs. Because his religion teaches that *no one* should bear arms, drafting another person in his place would make him responsible for the military activities of his replacement, and by doing so would substantially burden his own sincere religious beliefs. Would this mean that by exempting him the government had forced him to

_____

[5] Wheaton notes that the back of the self-certification form provides third-party administrators with notice of their regulatory obligations. See Emergency Application for Injunction Pending Appellate Review 8; see also Appendix, *infra*. That notice is merely an instruction to third-party administrators; it is not a part of any of the representations required on the front of the form. No statement to which Wheaton must assent in any way reflects agreement with or endorsement of the notice.

'trigger' the drafting of a replacement who was not a conscientious objector, and that the Religious Freedom Restoration Act would require a draft exemption for both the Quaker and his non-Quaker replacement?" *Notre Dame*, 743 F. 3d, at 556.

Here, similarly, the filing of the self-certification form merely indicates to the third-party administrator that a religious nonprofit has chosen to invoke the religious accommodation. If a religious nonprofit chooses not to pay for contraceptive services, it is true that someone else may have a legal obligation to pay for them, just as someone may have to go to war in place of the conscientious objector. But the obligation to provide contraceptive services, like the obligation to serve in the Armed Forces, arises not from the filing of the form but from the underlying law and regulations.

It may be that what troubles Wheaton is that it must participate in *any* process the end result of which might be the provision of contraceptives to its employees. But that is far from a substantial burden on its free exercise of religion.

Even if one were to conclude that Wheaton meets the substantial burden requirement, the Government has shown that application of the burden is "the least restrictive means" to further a "compelling governmental interest," §2000bb–1(b)(2). The contraceptive coverage requirement plainly furthers compelling interests in public health and women's well-being. See *Hobby Lobby*, *ante,* at 2 (KENNEDY, J. concurring). And it is the "least restrictive means" of furthering those interests. Indeed, as justification for its decision in *Hobby Lobby*—issued just this week—the very Members of the Court that now vote to grant injunctive relief concluded that the accommodation "constitutes an alternative that achieves all of the Government's aims while providing greater respect for reli-

gious liberty." *Ante,* at 3 (majority opinion); see also *ante,* at 4 ("The effect of the [Dept. of Health and Human Services (HHS)]-created accommodation on the women employed by Hobby Lobby and the other companies involved in these cases would be precisely zero. Under that accommodation, these women would still be entitled to all FDA-approved contraceptives without cost sharing"); *ante,* at 44 ("At a minimum . . . [the accommodation] does not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS's stated interests equally well"); see also *ante,* at 4 (KENNEDY, J., concurring) ("[I]t is the Court's understanding that an accommodation may be made to the employers without imposition of a whole new program or burden on the Government. As the Court makes clear, this is not a case where it can be established that it is difficult to accommodate the government's interest, and in fact the mechanism for doing so is already in place"). Today's grant of injunctive relief simply does not square with the Court's reasoning in *Hobby Lobby*.

It should by now be clear just how far the Court has strayed in granting Wheaton an interlocutory injunction against the enforcement of the law and regulations before the courts below have adjudicated Wheaton's RFRA claim. To warrant an injunction under the All Writs Act, the Court must have more than a bare desire to suspend the existing state of affairs; Wheaton's entitlement to relief must be indisputably clear. While Wheaton's religious conviction is undoubtedly entitled to respect, it does not come close to affording a basis for relief under the law.

C

The Court's approach imposes an unwarranted and unprecedented burden on the Government's ability to administer an important regulatory scheme. The Execu-

tive is tasked with enforcing Congress' mandate that preventative care be available to citizens at no cost beyond that of insurance. In providing the accommodation for which Wheaton is eligible, the Government has done a salutary thing: exempt religious organizations from a requirement that might otherwise burden them. Wheaton objects, however, to the minimally burdensome paperwork necessary for the Government to administer this accommodation. If the Government cannot require organizations to attest to their views by way of a simple self-certification form and notify their third-party administrators of their claimed exemption, how can it ever identify the organizations eligible for the accommodation and perform the administrative tasks necessary to make the accommodation work? The self-certification form is the *least* intrusive way for the Government to administer the accommodation. All that a religious organization must do is attest to the views that it holds and notify its third-party administrator that it is exempt. The Government rightly accepts that attestation at face value; it does not question whether an organization's views are sincere. It is not at all clear to me how the Government could administer the religious nonprofit accommodation if Wheaton were to prevail.

The Court has different ideas, however. Stepping into the shoes of HHS, the Court sets out to craft a new administrative regime. Its order grants injunctive relief so long as Wheaton "informs the Secretary of Health and Human Services in writing that it is a non-profit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services." *Supra*, at 1. And it goes further—"[t]o meet the condition for injunction pending appeal," the Court continues, Wheaton "need not use the [self-certification] form prescribed by the Government . . . and need not send copies to health insurance issuers or third-party administrators." *Ibid.* This

Court has no business rewriting administrative regula-
tions. Yet, without pause, the Court essentially does just
that.[6]

It is unclear why the Court goes to the lengths it does to
rewrite HHS's regulations. Presumably the Court intends
to leave to the agency the task of forwarding whatever
notification it receives to the respective insurer or third-
party administrator. But the Court does not even require
the religious nonprofit to identify its third-party adminis-
trator, and it neglects to explain how HHS is to identify
that entity. Of course, HHS is aware of Wheaton's third-
party administrator in this case. But what about other
cases? Does the Court intend for HHS to rely on the filing
of lawsuits by every entity claiming an exemption, such
that the identity of the third-party administrator will
emerge in the pleadings or in discovery? Is HHS to under-
take the daunting—if not impossible—task of creating a
database that tracks every employer's insurer or third-

_____

[6] This case is crucially unlike *Little Sisters of the Poor* v. *Sebelius*, 571
U. S. ___ (2014). There, the Court issued a comparable order "based on
all the circumstances of the case"—in particular, the fact that the
applicants' third-party administrator was a "church plan" that had no
legal obligation or intention to provide contraceptive coverage. See
*Little Sisters of the Poor* v. *Sebelius*, 2013 WL 6839900, *10–*11, *13 (D
Colo., Dec. 27, 2013). As a consequence, whatever the merits of that
unusual order, it did not affect any individual's access to contraceptive
coverage. Not so here. Wheaton's third-party administrator bears the
legal obligation to provide contraceptive coverage only upon receipt of a
valid self-certification. See 26 CFR §54.9815–2713A(b)(2) (2013); 29
CFR §2510.3–16(b) (2013). Today's injunction thus risks depriving
hundreds of Wheaton's employees and students of their legal entitle-
ment to contraceptive coverage. In addition, because Wheaton is
materially indistinguishable from other nonprofits that object to the
Government's accommodation, the issuance of an injunction in this case
will presumably entitle hundreds or thousands of other objectors to the
same remedy. The Court has no reason to think that the administra-
tive scheme it foists on the Government today is workable or effective
on a national scale.

party administrator nationwide?  And, putting that aside, why wouldn't Wheaton's claim be exactly the same under the Court's newly-fashioned system?  Either way, the end result will be that a third-party administrator will provide contraceptive coverage.  Surely the Court and Wheaton are not just objecting to the use of one stamp instead of two in order to avail itself of the accommodation.

The Court's actions in this case create unnecessary costs and layers of bureaucracy, and they ignore a simple truth: The Government must be allowed to handle the basic tasks of public administration in a manner that comports with common sense.  It is not the business of this Court to ensnare itself in the Government's ministerial handling of its affairs in the manner it does here.

*          *          *

I have deep respect for religious faith, for the important and selfless work performed by religious organizations, and for the values of pluralism protected by RFRA and the Free Exercise Clause.  But the Court's grant of an injunction in this case allows Wheaton's beliefs about the effects of its actions to trump the democratic interest in allowing the Government to enforce the law.  In granting an injunction concerning this religious nonprofit accommodation, the availability of which served as the premise for the Court's decision in *Hobby Lobby*, the Court cannot possibly be applying our longstanding requirement that a party's entitlement to relief be indisputably clear.

Our jurisprudence has over the years drawn a careful boundary between majoritarian democracy and the right of every American to practice his or her religion freely. We should not use the extraordinary vehicle of an injunction under the All Writs Act to work so fundamental a shift in that boundary.  Because Wheaton cannot justify the relief it seeks, I would deny its application for an injunction, and I respectfully dissent from the Court's refusal to do so.

# APPENDIX[7]

**EBSA FORM 700-- CERTIFICATION**
**(To be used for plan years beginning on or after January 1, 2014)**

This form is to be used to certify that the health coverage established or maintained or arranged by the organization listed below qualifies for an accommodation with respect to the federal requirement to cover certain contraceptive services without cost sharing, pursuant to 26 CFR 54.9815-2713A, 29 CFR 2590.715-2713A, and 45 CFR 147.131.

Please fill out this form completely. This form must be completed by each eligible organization by the first day of the first plan year beginning on or after January 1, 2014, with respect to which the accommodation is to apply, and be made available for examination upon request. This form must be maintained on file for at least 6 years following the end of the last applicable plan year.

| | |
|---|---|
| Name of the objecting organization | |
| Name and title of the individual who is authorized to make, and makes, this certification on behalf of the organization | |
| Mailing and email addresses and phone number for the individual listed above | |

I certify that, on account of religious objections, the organization opposes providing coverage for some or all of any contraceptive services that would otherwise be required to be covered; the organization is organized and operates as a nonprofit entity; and the organization holds itself out as a religious organization.

Note: An organization that offers coverage through the same group health plan as a religious employer (as defined in 45 CFR 147.131(a)) and/or an eligible organization (as defined in 26 CFR 54.9815-2713A(a); 29 CFR 2590.715-2713A(a); 45 CFR 147.131(b)), and that is part of the same controlled group of corporations as, or under common control with, such employer and/or organization (within the meaning of section 52(a) or (b) of the Internal Revenue Code), may certify that it holds itself out as a religious organization.

*I declare that I have made this certification, and that, to the best of my knowledge and belief, it is true and correct. I also declare that this certification is complete.*

_____
Signature of the individual listed above

_____
Date

_____

[7] Source: United States Dept. of Labor, online at http://www.dol.gov/ebsa/pdf/preventiveserviceseligibleorganizationcertificationform.pdf (as visited July 2, 2014, and available in Clerk of Court's case file).

Appendix to opinion of SOTOMAYOR, J., dissenting

The organization or its plan must provide a copy of this certification to the plan's health insurance issuer (for insured health plans) or a third party administrator (for self-insured health plans) in order for the plan to be accommodated with respect to the contraceptive coverage requirement.

Notice to Third Party Administrators of Self-Insured Health Plans

In the case of a group health plan that provides benefits on a self-insured basis, the provision of this certification to a third party administrator for the plan that will process claims for contraceptive coverage required under 26 CFR 54.9815-2713(a)(1)(iv) or 29 CFR 2590.715-2713(a)(1)(iv) constitutes notice to the third party administrator that the eligible organization:

(1) Will not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services; and

(2) The obligations of the third party administrator are set forth in 26 CFR 54.9815-2713A, 29 CFR 2510.3-16, and 29 CFR 2590.715-2713A.

This certification is an instrument under which the plan is operated.

PRA Disclosure Statement

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 1210-0150. Each organizations that seeks to be recognized as an eligible organization that qualifies for an accommodation with respect to the federal requirement to cover certain contraceptive services without cost sharing is required to complete this self-certification from pursuant to 26 CFR 54.9815-2713A(a)(4) in order to obtain or retain the benefit of the exemption from covering certain contraceptive services. The self-certification must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974, which generally requires records to be retained for six years. The time required to complete this information collection is estimated to average 50 minutes per response, including the time to review instructions, gather the necessary data, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: U.S. Department of Labor, Employee Benefits Security Administration, Office of Policy and Research, 200 Constitution Avenue, N.W., Room N-5718, Washington, DC 20210 or email ebsa.opr@dol.gov and reference the OMB Control Number 1210-0150.